# AFFIDAVIT OF TASK FORCE OFFICER CHRISTOPHER GOSSELIN IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Task Force Officer Christopher Gosselin, Drug Enforcement Administration, being duly sworn, depose and state as follows:

## Agent Background

1. I am a Task Force Officer with the Drug Enforcement Administration (DEA), currently assigned to the DEA Portsmouth Tactical Diversion Squad. I have been a Task Force Officer with DEA since 2017. I have been in full time law enforcement since January of 2006.

2. During my employment with DEA and my time in law enforcement, I have participated in numerous investigations relating to the distribution of controlled substances, including fentanyl, methamphetamine, cocaine, marijuana, various prescription medications, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections 846 and 841(a)(1), and the drug laws of the States of New Hampshire and Maine. I have received training in the field of narcotics enforcement and investigations.

3. I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs. I have been the Affiant on affidavits in support of arrest warrants, search warrants, and other applications. I have also participated in other electronic intercept investigations. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs. I am familiar with the common appearance, packaging, and texture, of narcotics including fentanyl, heroin, oxycodone, and other

illegal drugs. I have debriefed numerous defendants, informants and witnesses who had personal knowledge about narcotics trafficking activities, and the operation of narcotics trafficking organizations. Personally, I have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, and acting in an undercover capacity.

4. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

5. I am also aware of the various ways that drug dealers use cellular telephones – particularly smartphones capable of accessing the internet – in ways beyond traditional placing and receiving of telephone calls. Users of cellular telephones (including drug dealers) send and receive information via Short Message Service (SMS, commonly referred to as texts); Multimedia Messaging Service (MMS, i.e. a text with a file such as video or photo attached), messaging applications such as Whatsapp, iMessage, Signal, social media applications, and access the internet with their cellular telephones. Service providers capture transactional information whenever a device

2

accesses the cellular network. This transactional information can include the location of the device relative to the nearest tower being utilized. Cellular telephones are also equipped with Wi-Fi capabilities, allowing devices to function without the cellular network. Devices can access the internet, use applications such as messaging applications and email, make Wi-Fi phone calls, all without the use of the cellular network.

6. Based upon my training and experience, because drug traffickers usually carry their cellular phones on their persons to further their drug trafficking activities, tracking drug traffickers' cellular phones frequently leads to evidence of narcotics and money laundering offenses, including, but not limited to: (a) the identification of potential criminal associates, such as criminal co-conspirators, suppliers of illegal narcotics, and money launderers; (b) the identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; and/or (c) the identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions and laundered, including private businesses, banks, wire-remitter businesses, and other financial institutions.

## Purposes of the Affidavit

7. **Cell Site Simulator Warrant**: I submit this affidavit in support of an application for a warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, described in Attachment B, (the "Cell Site Simulator Warrants") to determine the location of the following cellular devices (collectively, the "Target Mobile Phones"):

    a. Mobile phone assigned **603-804-0210**, subscribed to Reseller Tracfone, that is believed to be used by MENDEZ HERRERA and others. The service provider for this phone is Verizon Wireless ("Verizon"), a wireless telephone service provider that accepts service of process at 180 Washington Valley Road, Bedminster, NJ and at VSAT.CCT@verizon.com ("Target Mobile Phone #1"). Target Mobile Phone #1 is further described in Attachment A-1.

    b. Mobile phone assigned **603-953-8347**, subscribed to Reseller Tracfone, that is believed to be used by MENDEZ HERRERA and others. The service provider for this phone is Verizon Wireless ("Verizon"), a wireless telephone service provider that accepts service of process at 180 Washington Valley Road, Bedminster, NJ and at VSAT.CCT@verizon.com ("Target Mobile Phone #2"). Target Mobile Phone #2 is further described in Attachment A-2.

8. Based on my experience with past executions of warrants seeking the precise location information for a cellular device, I have learned that due to the location of cellular towers in rural areas, where investigators expect to locate the Target Mobile Phones, the location information supplied by the phone companies is not sufficiently precise to identify a building in a rural area or a specific mobile home within an area to locate the Target Mobile Phones. The technique described in Attachment B will assist law enforcement with locating the Target Mobile Phones in these rural areas. Further, it frequently becomes necessary to enter within the curtilage of private residences and/or the common areas of apartment buildings to utilize the cell-site simulator to identify precisely the correct home within an area in which the Target Mobile Phones are located, and I request authorization to do so. As detailed below, the Target Mobile Phones for which I request the use of this technique are believed to be located in the District of Maine.

9. **Cell Phone Location Warrant**: I also make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18

U.S.C. § 2703(c)(1)(A) for both historical and prospective information about the location of Target Mobile Phone #2. The requested prospective location data to be seized is further described in Attachment C, and the historical location information is further described in Attachment D.

10. I submit this affidavit in furtherance of an ongoing criminal investigation into MENDEZ HERRERA and others (collectively, the "Target Subjects") concerning violations of federal law including Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute controlled substances and distribution of controlled substances) (the "Target Offenses").

11. As further described below, there is probable cause to believe that: the Target Subjects have committed, are committing, and will continue to commit the Target Offenses; (b) the Target Mobile Phones are being and will be used to facilitate the commission of these offenses; and (c) the data obtained about the geographic location of the Target Mobile Phones will constitute and/or will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of the individuals who are committing those and related crimes. There is also probable cause to believe that the Target Mobile Phones are each and both instrumentalities of and are being used in committing the Target Offenses.

12. As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation. I submit this affidavit for the limited purpose of establishing probable cause for the requested warrants. This affidavit is intended to provide the facts necessary for a determination of probable cause

for the requested warrant.

## Probable Cause

*Investigation Background and Prior Affidavits*

13.     Since early 2023, investigators have been working with a cooperating witness (the "CW") to identify and investigate drug trafficking targets with whom the CW was familiar based on the CW's prior experience as a drug trafficker. The CW was arrested and charged after investigators observed the CW arrange for and distribute large quantities of fentanyl. The CW is now cooperating with investigators in the hopes that the CW receives a lower sentence for charges resulting from that investigation.[1]

14.     Throughout the CW's cooperation, the CW has identified several drug-trafficking targets, including MENDEZ HERRERA. With authorization of supervising investigators, the CW and MENDEZ HERRERA remain in regular communication and frequently discuss MENDEZ HERRERA's ongoing drug trafficking activities. Because MENDEZ HERRERA appears to trust the CW as a fellow drug trafficker, MENDEZ HERRERA often shares specific details about his trafficking, including his plans to travel to retrieve and/or deliver drugs.

15.     As part of this ongoing investigation and based on information provided by the CW and corroborated by investigators, on May 17, 2024, the Honorable Donald L. Cabell authorized a warrant for the prospective and historical location information for

---

[1] Other than the CW's participation in the charged case, the CW has no additional criminal history. Investigators have worked with the CW proactively to investigate additional narcotics traffickers. Information provided by the CW has led to the identification of additional targets and the seizure of narcotics. The CW's information has been corroborated to the extent possible. Based on all of the above, investigators believe information provided by the CW to be reliable.

Target Mobile Phone #1. 24-mj-1258-DLC. On August 7, 2024, the Honorable Donald L. Cabell authorized a warrant for the prospective and historical location information for Target Mobile Phone #1. 24-mj-1447-DLC. On October 15, 2024, the Honorable Donald L. Cabell authorized warrants for the prospective and historical location information for Target Mobile Phone #1. 24-mj-1559-DLC.

16. After investigators obtained the most recent location warrant for Target Mobile Phone #1, starting on October 16, 2024, all location data for that phone has shown it to be located within Maine in the Waldo County area.

*On October 16-17, 2024, MENDEZ HERRERA Used Target Mobile Phones #1 and #2 to Arrange the Sale of Suspected Crystal Methamphetamine to an Undercover Officer.*

17. On October 15, 2024, in lightly coded language, an officer acting in an undercover capacity (the "UC") sent a text message to MENDEZ HERRERA, using Target Mobile Phone #1, stating that he wanted to purchase crystal methamphetamine. MENDEZ HERRERA replied, "Steven House" and "400 Dollar Ice." During this investigation, investigators had identified the address associated with "Steven House" as 209A Hatch Road, Jackson, Maine ("209A Hatch Road"). The Maine Drug Enforcement Agency ("MDEA") informed the DEA that Steven Lamperta resided at this address. Through a confidential source, the MDEA identified 209A Hatch Road as a suspected drug trafficking location. Based on experience and training, investigators believe that MENDEZ HERRERA agreed to sell methamphetamine ("ice") to the UC for $400 per ounce ("400 Dollar") and that the UC should pick up the methamphetamine at 209A Hatch Road.

18. On October 15, 2024, the UC exchanged several more text messages with MENDEZ HERRERA, using Target Mobile Phone #1. MENDEZ HERRERA texted the

7

UC two more times "Steven house," confirming the location. MENDEZ HERRERA then called the UC from Target Mobile Phone #1, but the UC was not in a position to answer. The UC was then not able to get back in touch with MENDEZ HERRERA.

19.  Because the UC was not able to get in touch with MENDEZ HERRERA after the October 15, 2024 exchange, investigators instructed the CW to contact MENDEZ HERRERA. On October 16, 2024, at investigators' direction, the CW placed a recorded telephone call to MENDEZ HERRERA at Target Mobile Phone #1. The call was recorded but has not yet been translated. After this phone call, the CW relayed the contents of the conversation to investigators and investigators also reviewed the recording. The CW stated that the CW's drug customer (the UC), was trying to get in touch with MENDEZ HERRERA to purchase drugs, but MENDEZ HERRERA had not been answering his phone. In lightly coded language, MENDEZ HERRERA stated that he would sell one ounce of methamphetamine for $400 but would lower the price to $300 per ounce if the UC ordered a greater quantity. During this phone call, MENDEZ HERRERA paused the phone call to speak with another unknown male ("UM-1"). Investigators reviewed the recording of this phone call and heard UM-1 say, in English, "I want your good stuff, bud." MENDEZ HERRERA responded by saying, "one." UM-1 stated, "As long as that's the good stuff" and "what you got?" Investigators could also hear a female voice on speaker phone in the recording. The female appeared to be translating for MENDEZ HERRERA. UM-1 stated, "I want like a ball," and "you got 5, the hard too?" Based on experience and training, investigators believe that MENDEZ HERREA, while speaking to the CW on Target Mobile Phone #1, was conducting a separate drug deal with UM-1.

8

20. The phone call continued, and investigators heard the female speaking in both English and Spanish and UM-1 speaking in English. At one point, UM-1 stated that he "trusts Steven...I don't trust a lot of these other fuckers." Based on experience and training, and the text messages between the UC and MENDEZ HERRERA, described above, investigators believe UM-1 was referring to Steven Lamperta.

21. Later, on October 16, 2024, at investigators' direction, the CW placed another recorded call to MENDEZ HERRERA at Target Mobile Phone #1. MENDEZ HERRERA told the CW to have the UC contact him on Target Mobile Phone #1. While the CW was speaking with MENDEZ HERREA on Target Mobile Phone #1, MENDEZ HERRERA, using Target Mobile Phone #2, called the UC. The UC recognized the male voice as MENDEZ HERRERA's. Throughout this investigation, investigators have identified numerous phone numbers used by MENDEZ HERRERA, including Target Mobile Phones #1 and #2. Based on experience and training, it is common for drug traffickers to use multiple cellular phones to avoid law enforcement detection.

22. At this point, MENDEZ HERRERA was speaking with the CW on Target Mobile Phone #1 and the UC on Target Mobile Phone #2. The CW was acting as a translator between MENDEZ HERRERA and the UC. During this phone call, the UC, the CW, and MENDEZ HERRERA discussed prices and logistics for the UC's methamphetamine purchase. For example, in lightly coded language, the CW, translating for MENDEZ HERRERA, stated that for one ounce of methamphetamine, the price would be $400, but if the UC purchased more than one ounce, the price would go down to $300 per ounce. This statement is consistent with MENDEZ HERRERA's

9

statements to the CW regarding methamphetamine quantities and prices in the previous call, described above.

23. On October 17, 2024, at approximately 12:01 p.m., the UC sent a text message to MENDEZ HERRERA at Target Mobile Phone #2 stating, "I want 3 ounces of Ice bro. Can I get that today?" MENDEZ HERRERA, using Target Mobile Phone #2, replied, "Stevens house" and "209 hatch road." In a follow-up phone call with MENDEZ HERRERA, using Target Mobile Phone #2, in lightly coded language, MENDEZ HERRERA stated that he would sell the UC three ounces of methamphetamine for $900. Based on experience and training, investigators believed that MENDEZ HERRERA was prepared to sell the UC three ounces of methamphetamine from 209A Hatch Road.

24. On October 17, 2024, at approximately 5:36 p.m., the UC received two videos via text message from MENDEZ HERRERA, using Target Mobile Phone #2. The videos showed a dirt driveway with several cars and boats in the background parked near a white mobile home. At 5:59 p.m., the UC received a photo from MENDEZ HERRERA, using Target Mobile Phone #2, with a photo of the same dirt driveway. Investigators understood these videos and photo to be views of 209A Hatch Road to show the UC where he should park when he arrived for the methamphetamine deal.

25. On October 17, 2024, prior to meeting with MENDEZ HERRERA, the UC met with other investigators and was equipped with an audio/video recording device. The UC also received $900 in Official Authorized Funds ("OAF"). The UC then drove to 209A Hatch Road. At approximately 6:07 p.m., the UC arrived in the driveway of 209A Hatch Road. The UC observed MENDEZ HERRERA standing at the edge of the

driveway. MENDEZ HERRERA motioned for the UC to turn into the driveway. The UC pulled up to MENDEZ HERRERA. MENDEZ HERRERA handed the UC a tied-off plastic bag containing a clear, crystalline substance, consistent in appearance with methamphetamine. MENDEZ HERRERA stated that the substance weighed "three ounces." The UC gave MENDEZ HERRERA the $900 in OAF. The UC then stated that he wanted more methamphetamine in the next purchase and asked how long it would take MENDEZ HERRERA to get more methamphetamine. MENDEZ HERRERA indicated that he did not understand the UC and told the UC to call the CW. The UC understood MENDEZ HERRERA to mean that the UC should call the CW so that the CW could translate for the UC. The UC stated that he could not contact the CW.

26.     MENDEZ HERRERA then walked to the white mobile home at 209A Hatch Road. The UC lost sight of MENDEZ HERRERA when he reached the mobile home. Approximately one minute later, MENDEZ HERRERA returned to the UC with a cellular phone. MENDEZ HERRERA placed an initial call which went unanswered. MENDEZ HERRERA then placed another phone call. The UC could hear a female speaking in Spanish on the call. MENDEZ HERRERA then placed the call on speaker phone so the UC could hear both sides of the conversation. The female speaker started translating for MENDEZ HERRERA. In lightly coded language, the UC asked how much notice MENDEZ HERRERA would need if the UC wanted to purchase half a pound of methamphetamine. After the female translated, MENDEZ HERRERA replied in Spanish and then the female stated, "two days earlier." Investigators understood this to mean that MENDEZ HERRERA needed two days' notice to provide half a pound of methamphetamine. The UC then asked if he was buying a greater quantity if the price

11

would go below $300 per ounce. MENDEZ HERRERA then used a calculator and stated $2,000 would be the price for half a pound of methamphetamine. The UC agreed to the price and quantity and MENDEZ HERRERA walked back to the white trailer at 209A Hatch Road.

27.  The UC transported the suspected methamphetamine to the DEA office. Investigators conducted a field test which yielded a positive result for methamphetamine. The drugs have been sent to the DEA laboratory for testing and the results are pending. Based on experience and training, the positive field test, and appearance of the substance, investigators believe the substance contains methamphetamine.

## **The Relevant Technology – Cell Phone Location Warrant**

28.  I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, (2) cell-site data, also known as "tower/face information" or cell tower/sector records, and (3) Call Detail Records (CDRs).

29.  E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

30.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or

more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

31. Based on my training and experience, I know that Verizon can collect cell-site data about Target Mobile Phone #2. I also know that wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. CDRs are a type of these records and they contain data regarding telecommunications transactions without providing the content of that transaction. In part, the data contained in these CDRs includes cell site information utilized during the transaction.

32. Based on my training and experience, I know that wireless providers such as Verizon also collect data about the speed with which signals travel between cellular telephones and cellular towers ("per call measurement data," or "PCMD"). For each cellular telephone accessing its network, providers such as Verizon use PCMD and other data to calculate and record the estimated location of that cellular telephone. T-Mobile refers to the resulting location information as Timing Advanced Information, and/or Timing Advance Report Date ("True Call"). Provider AT&T refers to this information as NELOS (Network Event Location System) and Provider Verizon Wireless refers to this information as RTT (Round-Trip Timing). Based on my training and experience, I know that wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the

method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, I have learned that this information may constitute evidence of the crimes under investigation because the information can be used to identify user or users of a device, and may assist in the identification of co-conspirators and/or victims.

### Authorization Request– Cell Phone Location Warrant for Target Phone 2[2]

33. I request that the Court issue the proposed location search warrant as to Target Phone 2, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.[3]

34. I also request that the Court direct Verizon (the service provider) to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachments C and D unobtrusively and with a minimum of interference with the service provider's services, including by initiating a signal to determine the location of Target Mobile Phone2 on the service provider's network, and at such intervals and times as directed by the

---

[2] As indicated above, the DEA previously obtained a similar active warrant as to Target Phone 1. Accordingly, no corresponding warrant is sought in this District for Target Phone 1.

[3] 18 U.S.C. 2703(c) authorizes a "court of competent jurisdiction" to issue a search warrant for the kinds of records that this application seeks. A "court of competent jurisdiction" includes a district court ("including a magistrate judge") that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

government. The government will compensate the service provider for reasonable expenses incurred in furnishing such facilities or assistance.

35. I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order the service provider not to notify any person (including the subscribers or customers to whom the materials relate) of the existence of this application, the warrant, or the execution of the warrant, for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b). The service provider may disclose this Order to attorneys for the service provider for the purpose of receiving legal advice. Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the investigation. There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation including by giving targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or physical safety of an individual. *See* 18 U.S.C. § 2705(b). Moreover, some of the evidence in this investigation is stored electronically. If alerted to the existence of the Order, the targets could destroy that evidence, including information saved to their personal computers, on other electronic media, or in social media accounts.

36. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrants

15

to delay any required notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber(s) or user(s) of Target Mobile Phone #2 would seriously jeopardize the ongoing investigation, as such a disclosure would give that person(s) an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachments C and D, which are incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrants authorize the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

37. I further request that the Court authorize execution of the location warrant described in Attachments C and D at any time of day or night, owing to the potential need to locate Target Mobile Phone #2 outside of daytime hours.

38. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court, except that the government may provide the warrant (and associated papers) to Verizon. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good

cause to seal these documents because their premature disclosure may seriously jeopardize this investigation.

### Cell Site Simulator Warrant – Authorization Request

39. Based on the foregoing, I request that the Court issue the proposed Cell Site Simulator Warrant as to the Target Mobile Phones, pursuant to Federal Rule of Criminal Procedure 41.

40. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing these warrants to delay any required notice until 30 days after the collection authorized by this warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Mobile Phones would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrants, the proposed search warrants do not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrants authorize the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

41. I further request that the Court authorize execution of the Cell Site Simulator Warrant at any time of day or night, owing to the potential need to locate the Target Mobile Phones outside of daytime hours.

### Cell Site Simulator Warrant – Manner of Execution

42. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers, including the call number.

43. To facilitate execution of the Cell Site Simulator Warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Mobile Phones, or receiving signals from nearby cellular devices, including the Target Mobile Phones. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Mobile Phones and thereby prompt them to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the Target Mobile Phones and use that information to determine the locations of the Target Mobile Phones, even if they are located inside a house, apartment, or other building.

44. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the

interference with such devices. However, upon detecting a 911 emergency call by any cell phone the system will stop transmission and allow the emergency call to be placed by the caller's cellular network. In order to connect with the Target Mobile Phones, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be one of the Target Mobile Phones, and law enforcement will limit collection of information from devices other than the Target Mobile Phones. To the extent that any information from a cellular device other than the Target Mobile Phones is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Mobile Phone from all other cellular devices.

45. A search warrant may not be legally necessary to compel the investigative technique described in this section. Nevertheless, I submit this warrant application out of an abundance of caution.

## Conclusion

46. WHEREFORE, I submit that there is probable cause to believe that (a) the Target Subjects have committed, are committing, and will continue to commit the Target Offenses; (b) the Target Mobile Phones identified in Attachments A-1 and A-2 are being used to facilitate the Target Offenses; and (c) the locations of the Target Mobile Phones and the other information described in Attachments B, C, and D will constitute and/or will lead to evidence, fruits, and instrumentalities of the aforementioned crimes

as well as to the identification of individuals who are engaged in the commission of those and related crimes.

Respectfully submitted,

_____
Christopher Gosselin, Task Force Officer
Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Oct 24 2024

City and state: Bangor, ME

_____
John C Nivison U.S. Magistrate Judge
Printed name and title